**Dawn GLASS, individually and as guardian ad litem for Patrick Glass, a minor; et al., Plaintiffs,**

**v.**

**HILLSBORO SCHOOL DISTRICT 1J, Defendant.**

**No. CIV 00–1058–JO.**

United States District Court, D. Oregon.

April 13, 2001.

Dennis Steinman, Steinman Cooper Wiscarson, Portland, OR, Attorney for Plaintiffs.

Andrea L. Hungerford, Richard G. Cohn–Lee, The Hungerford Law Firm, Oregon City, OR, Attorneys for Defendant.

## OPINION AND ORDER

JONES, District Judge.

Plaintiffs Dawn Glass, Robert Glass, and Norman Lee, on behalf of themselves individually and as guardians ad litem of their minor children, bring this action against defendant Hillsboro School District 1J, alleging, among other claims, violations of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), and section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (" § 504"). Plaintiffs claim, in essence, that defendant refused to grant their "independent autism specialists" the same type of access to the special education classrooms that defendant allowed in regular education classrooms.

This is the second round of motions in this case. In the first round, defendant moved to dismiss plaintiffs' federal claims for lack of subject matter jurisdiction on the ground that they had failed to exhaust their administrative remedies as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. After a hearing, I denied the motion, concluding that "the issues raised and the relief sought do not fall within the ambit of the IDEA exhaustion requirement." Glass v. Hillsboro School Dist. 1J, Civil No. CV 00–1058–JO (Opinion and Order, Dec. 22, 2000)(# 36).

During the earlier proceedings, I questioned the validity of the parents' claim for damages, as opposed to the children's claims. Supplemental briefing on the issue did not resolve the question, and I voiced my ongoing concern over the validity of the parents' claims in my opinion on defendant's motion, as follows:

> [A]t the hearing, I questioned whether there was any authority supporting the *parents'* claims, as opposed to the children's claims, for compensatory damages for alleged "severe emotional distress," and requested supplemental briefing on the issue. Plaintiffs submitted authority for the proposition that parents may attain "associational" standing under the ADA and § 504. That authority, however, does not answer this court's question concerning the availability of compensatory damages to bystanders who, on the record developed thus far, appear to have suffered no direct injury caused by the conduct alleged and whose own civil rights are not at issue.
>
> That question, however, is not before me on the present motion. Nonetheless, I continue to be concerned about the viability of the parents' claims for emotional distress damages, and would seriously consider the issue on appropriate motion.

Opinion and Order, p. 11 (emphasis in original).

## THE PRESENT MOTION

Defendant now moves to dismiss (# 42) the individual claims of the plaintiff parents for failure to state a claim and for lack of subject matter jurisdiction, because, defendant contends, these plaintiffs have failed to allege that they suffered a separate, direct injury as a result of defendant's alleged discrimination. As explained below, defendant's motion is well-taken and is granted.

Plaintiffs' claims are "associational" discrimination claims, that is, they derive

their individual right to sue in this case solely through their association with their disabled children. The parties agree that associational claims are available under both the ADA and § 504. *See, e.g., Innovative Health Systems v. City of White Plains,* 117 F.3d 37, 46–48 (2nd Cir.1997); 28 C.F.R. § 35.130(g)[1]; *see also Tugg v. Towey,* 864 F.Supp. 1201, 1207 (S.D.Fla. 1994).[2] The parties also appear to agree that to state a valid claim for associational discrimination under either statute, a plaintiff must allege some "specific, direct, and separate injury" as a result of association with a disabled individual. *See, e.g., Micek v. City of Chicago,* 1999 WL 966970 at *3–4 (N.D.Ill.1999); *Niemeier v. Tri–State Fire Protection Dist.,* 2000 WL 1222207 at *3–4 (N.D.Ill.2000). The parties seriously disagree, however, on the key issue of whether plaintiffs' allegations meet that standard.

▮ Analytically, the "specific, direct, and separate injury" requirement is a "prudential" standing consideration related to the general Article III constitutional standing requirement. Accepting that Congress intended to provide for associational discrimination claims,[3] Article III standing requires a showing that (1) plaintiffs suffered an injury in fact; (2) the injury is fairly traceable to defendant's actions; and (3) it is likely that plaintiffs' injury will be redressed by a favorable court ruling. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Additionally, even where the Article III standing requirements are met, plaintiffs must also demonstrate that they themselves were harmed; that is, that they suffered a specific, separate, and direct injury to themselves caused by defendant's actions. *See Niemeier,* 2000 WL 1222207 at *3–4.

In its present motion to dismiss, defendant appears to accept that the plaintiff parents meet the general Article III standing requirements. Defendant's argument focuses, instead, on whether the plaintiff parents' alleged injuries satisfy the prudential standing considerations of "separate" and "direct" injury.

## STANDARD

A Rule 12(b)(6) motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Gilligan v. Jamco Development Corp.,* 108 F.3d 246, 248 (9th Cir.1997)(*quoting Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995)); *see also Mountain High Knitting, Inc. v. Reno,* 51 F.3d 216, 218 (9th Cir.1995). The court must treat

---

1. 28 C.F.R. § 35.130(g) provides:

   A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

2. Very few published opinions address this issue.

3. Title I (employment) and Title III (transportation) of the ADA expressly include prohibitions on associational discrimination. *See* 42 U.S.C. §§ 12112(b)(4)(Title I) and 12182(b)(1)(E)(Title III). Title II, under which plaintiffs bring their claims, contains no similar language. In *Innovative Health Systems v. City of White Plains,* 117 F.3d 37, 47–48 (2nd Cir.1997), the Second Circuit found this omission not controlling, in view of Congress' direction that the regulations implementing Title II (*e.g.* 28 C.F.R. § 35.130(g), quoted *supra* at footnote 1) include a prohibition on associational discrimination by public entities. Defendant does not contend that associational discrimination claims are not available under Title II; consequently, I need not consider the issue.

all facts alleged in the complaint as true. *Parks School of Business, Inc.*, 51 F.3d at 1484. All doubts are resolved in favor of the nonmoving party. *Keams v. Tempe Technical Institute*, 39 F.3d 222, 224 (9th Cir.1994).

## DISCUSSION

Both sides analogize the factual circumstances in the few reported cases to the facts alleged in this case and conclude, not surprisingly, that the facts favor their respective positions. Plaintiffs' allegations concerning their injuries, which they claim to be direct injuries to them caused by defendant's alleged refusal to allow their experts in the special education classrooms, may be summarized as follows:

1. They were denied the benefits of defendant's services by reason of their children's disabilities (Second Amended Complaint ("Complaint"), ¶¶ 36(b),(f), and (j), and 50(b), (f), and (g));

2. They were excluded from participation in defendant's services solely by reason of their children's disabilities (Complaint, ¶¶ 36(d),(h), and (*l*), and 50(d), (h), and (*l*));

3. As a result of the above, they suffered injury caused by defendant's discrimination solely because of their association with their disabled children, in the form of financial loss, anxiety, humiliation, and severe emotional distress (Complaint, ¶¶ 38, 40, 51, 53, and 55).

With the above allegations in mind, I consider cases in which other courts have or have not found the necessary "specific, separate, and direct injury" required to sustain an associational discrimination claim. In *Niemeier v. Tri–State*, 2000 WL 1222207 (N.D.Ill.2000), for example, plaintiff husband was employed by Tri–State, which provided a health/medical benefits plan to husband and his wife. Wife was infertile, and husband and wife sought treatment for infertility. Tri–State initially paid for the treatment, then denied plaintiffs' claims for reimbursement. Plaintiffs then sued for disability discrimination under the ADA.

As relevant to the pending motion, husband alleged an associational discrimination claim, asserting that he was denied equal benefits under the insurance plan because of his marriage to a disabled individual. Specifically, husband alleged that he suffered injury to " 'his opportunity to reproduce and ... raise a family ... with his wife.'" *Niemeier*, 2000 WL 1222207 at *4 (citation omitted). The court found that allegation insufficient and dismissed husband's ADA claim, commenting that

> While this may be true, this injury results from his wife's disability and is not a separate and distinct injury caused by Tri–State's actions. Further, [husband] has not alleged that he was given a different plan or fewer benefits [than other employees] because he was known to have a wife with a disability. Rather, he had the same coverage as other Tri–State employees and their dependents.

2000 WL 1222207 at *4.

In their response to defendant's motion, plaintiffs distinguish *Niemeier* as follows: "Unlike the defendant in *Niemeier*, Defendant specifically singled out Plaintiff parents and provided them with fewer options than it provided for parents of non-disabled children. * * * Because of Defendant's policy, Plaintiff parents were singled out and were provided fewer options than parents of non-disabled children." Plaintiffs' Response, p. 12. Defendant, in turn, argues that husband's claim in *Niemeier* parallels plaintiffs' claims here. According to defendant, plaintiffs allege economic detriment, but as in *Niemeier*, their expenditures and other injuries were "ancillary" to their children's disabilities, *i.e.*,

the expenditures were incurred for one purpose only: "To allegedly secure the optimum special education placement for their children, *not* to correct any injury done to the parents." Defendant's Reply, p. 4 (emphasis in original).

The decision in *Simenson v. Hoffman,* 1995 WL 631804 (N.D.Ill.1995), is perhaps more helpful to understanding the distinction between a separate, direct injury, which is actionable, and a derivative-type injury, which is not. In *Simenson,* a two-year old child, Jonathan, was disabled by, among other things, a severe genetic skin disorder that caused numerous visible lesions on his face and chest. Jonathan became ill with what his regular pediatrician diagnosed as probable flu, but eventually became much worse, causing his parents to seek medical treatment from different providers. Jonathan was scheduled on an emergency basis to see Dr. Hoffman, a physician near retirement who no longer took pediatric patients.

In the examining room and without first looking at Jonathan, Dr. Hoffman asked the parents to describe his condition. The mother recounted the various symptoms. The father removed Jonathan's coat, at which point Dr. Hoffman saw the lesions and "yelled that he would not treat 'that sick child.'" *Simenson,* 1995 WL 631804 at *2. What happened next is described in the opinion as follows:

> Hoffman then yelled at the Simensons, telling them to take Jonathan to his own pediatrician. [The mother] replied that they had tried, but Dr. Greenwald was on vacation and they were concerned about Jonathan's condition. She asked Hoffman to listen to Jonathan's lungs to see if he had pneumonia. Hoffman refused, became hostile, said loudly that he was "not getting in the middle of this," and said that Jonathan should see other doctors. * * * He then yelled at

the Simensons to "get out of the office", pointed to the door, and walked out of the examining room.

*Id.* at *2.

Among their other claims in the resulting lawsuit, plaintiff parents brought an associational discrimination claim under the ADA. Defendants argued, as does defendant in this case, that the plaintiff parents failed to state a claim because they suffered no discrimination (*i.e.,* the child, not the parents, was denied medical services) and had no standing to sue. The parents, in turn, argued that the denial of medical services to the child was a separate and distinct denial of services to them, in that "they were ejected from the medical center because of Hoffman's refusal to treat Jonathan, and thus were barred from the medical center based on Jonathan's disability." *Id.* at *6.

The court first noted that "the treatment of the child is at the center of the dispute." *Id.* As the court characterized it, "[t]he only relevant question * * * is whether the [parents] suffered a separate injury when Hoffman refused to treat their child and ejected him from the facility." *Id.*

The court rejected the parents' theory of separate injury, reasoning that:

> [D]enial of admission to a movie theater or a hotel constitutes a separate injury because the companion is denied the use of the service or facility. The [parents] were not at the medical center for any purpose other than to seek treatment for Jonathan. Jonathan's ejection, and that of his parents, was merely the final act in the decision to deny him medical treatment. The [parents'] claim for associational discrimination must be dismissed.

*Id.* at *6.[4]

Plaintiffs argue that *Simenson* is distinguishable on the following basis:

The *Simenson* court found that the only reason that the parents of a disabled child were at the medical facility was to seek medical services for their disabled child. * * *

Here, Plaintiff Parents were not merely applying for services for their disabled children. Instead, Plaintiff Parents wanted to actively attend and observe Defendant's educational program. Plaintiff Parents needed to observe the disabled children's classroom to determine whether the special education instruction that Defendant was providing would be appropriate for their children. Plaintiff Parents *themselves* were seeking to participate in Defendant's services, but Defendant denied them the opportunity to participate because of their association with disabled children.

Plaintiffs' Response, p. 13 (citations omitted; emphasis in original).

Defendant makes two observations about the above response. First, the parents have not alleged that *they* wanted to observe the classroom, only that they wanted *their experts* to observe the classroom. *See* Complaint, ¶¶ 10–14. Second, defendant suggests that if any consideration is to be given to the parents' claim that they were unable to be fully informed about their children's education because they were denied access to the classroom, then plaintiffs have effectively made the matter at issue an educational issue; *i.e.*, they have effectively brought their claims back within the ambit of the IDEA and the IDEA exhaustion requirements.[5]

*Tugg v. Towey*, 864 F.Supp. 1201 (S.D.Fla.1994), is an example of a case in which an associational discrimination claim was allowed to go forward. In *Tugg*, deaf and hearing-impaired individuals and their non-disabled family members, all of whom were eligible for mental health counseling services, sought an injunction under the ADA to require the state to provide counselors with sign language ability, rather than counselors assisted by sign language interpreters. The family member plaintiffs contended that without the injunction, they would be denied the mental health services *they themselves needed* to help their deaf or hearing-impaired dependents. The court concluded that the plaintiffs demonstrated standing to sue under the ADA. 864 F.Supp. at 1208.

It appears that whether I accept plaintiffs' theory of "separate and direct injury" in this case depends on whether I accept their contention that they had some personal right—separate from and independent of their children's placement in the defendant school—to have their experts observe defendant's classrooms. The *Simenson* court's movie theater analogy sheds some light on the relevant distinction: Everyone, generally, has the right to go into a movie theater. If a non-disabled companion is excluded from the theater because of his or her association with a disabled individual (for example, no room

---

**4.** *See also Micek v. City of Chicago,* 1999 WL 966970 (N.D.Ill.1999)(father failed to state associational discrimination claim where employer's benefit plan did not cover speech therapy for hearing impaired wife and child and father incurred economic loss as result).

**5.** Based on that argument, defendant then renews its earlier motion to dismiss for failure to exhaust administrative remedies. In view of my disposition of the pending motion, I decline to reconsider my earlier ruling. I note, however, that I tend to agree with defendant that plaintiffs' rhetoric moves their claims precipitously close to, if not directly within, the reach of the IDEA.

in the theater for wheelchairs), then the non-disabled companion suffers direct harm to his or her own independent right to be in the theater because of the association with a disabled person.

Contrast this with the situation at issue in *Simenson,* where the reason the parents were in Dr. Hoffman's office was to obtain treatment for their son. They sought no treatment for themselves, and his ejection from the clinic, while it may have caused them distress, did not deny them some separate benefit to which they were entitled. If they also were sick and had expected treatment but were ejected from the clinic because of their son's disability, it most likely would be a different case.

■ In this case, the plaintiff parents struggle to align their claims with the *Simenson* theater analogy. They suggest that they had some separate right to observe defendant's special education classrooms, independent of their desire to ensure that their own children's placement was or would be proper. Thus, plaintiffs appear to recognize that to prevail on their associational discrimination claims, they must allege and prove that they, *not their children,* had a right to defendant's services, and that they were discriminated against in obtaining those services solely because they were associated with disabled individuals.

The plaintiff parents' desire to have their experts observe the classroom, however, is more akin to *Simenson* than *Tugg;* specifically, the parents have not alleged any separate and distinct denial of services to them, apart from their role as parents of children enrolled or proposed to be enrolled in defendant's programs. Instead, the plaintiff parents' allegations, reasonably construed in the light most favorable to them, show that their attempt to gain access for their experts to the special education classroom related solely to their children's education, and was not an attempt to exercise some independent and separate right to have access to the classroom for their own benefit.

Moreover, the parents do not allege that they asked to observe regular classrooms but were denied, because of their association with disabled individuals, the same access as any other parents. Likewise, the plaintiff parents do not allege that parents of non-disabled children were provided unrestricted access for their experts to observe the special education classrooms; it may reasonably be assumed that any parent likely would have run into the same requirements of which the plaintiff parents now complain.[6]

Having given this matter careful and thorough consideration, I conclude that the plaintiff parents do not have a valid associational discrimination claim. Consequently, defendant's motion to dismiss their claims is granted.[7]

---

**6.** Of course, the pending motion is a Rule 12 motion to dismiss, but I note that the parents do not allege that they were denied equal access to defendant's regular classrooms, or that parents of non-disabled children were given better access to the special education classrooms. In this way, the situation in the present case is analogous to that in *Micek.* In *Micek,* the same insurance coverage was provided to all employees, thus, the father could not demonstrate some distinct discrimination directed toward him because of his wife's and child's hearing impairments. *Micek,* 1999

WL 966970 at *3; *see also Niemeier,* 2000 WL 1222207 at *4 (plaintiff did not allege that he was given a different benefit plan or fewer benefits because he was known to have a disabled wife).

**7.** Defendant's motion and plaintiffs' response focus on the parents' ADA and § 504 claims, and do not separately address their negligence claim. Nonetheless, I perceive no reasoned basis on which to differentiate the analysis of the parents' negligence claim and,

## CONCLUSION

Defendant's motion to dismiss (# 42) the plaintiff parents' individual claims is GRANTED in its entirety.

therefore, conclude that it also should be dismissed.